## GEORGE H. BISHOP AND ANOTHER, TRUSTEES, *vs.* THE CLAY FIRE AND MARINE INSURANCE COMPANY.

The plaintiffs, who were trustees under a second mortgage of a railroad company, were in possession of and operating the road in 1874, and at that time procured of the defendants, a fire insurance company, a policy of insurance on a freight depot belonging to the road, the policy describing the insured as "trustees of the convertible mortgage" of the railroad company, and the property as "their frame freight depot building occupied by them," and containing a provision that "if any change shall take place in the title or possession of the property, whether by legal process, judicial decree, or voluntary transfer, this policy shall become void," and a further provision in another section, that "if the property is disposed of, so that all interest on the part of the assured has ceased, this insurance shall immediately terminate." In May, 1875, the state treasurer, as trustee under a prior mortgage of the road, obtained a decree of foreclosure against the plaintiffs as trustees under the second mortgage, and against the railroad company, which decree, by a failure to redeem, became absolute in June, 1875. The state treasurer took possession of the road and appointed the plaintiffs his agents to operate the road. They continued to do so, one of them acting as superintendent, as he had done while trustee. The state treasurer soon after conveyed the entire property to a new corporation, constituted of the holders of the first mortgage bonds, and the new company appointed another superintendent, who took

charge of the road early in August, 1875. On the 18th of August, and within the term of the policy, the building insured was burned. The building was at this time and had from the first been in the possession and charge of one B as a freight agent. The plaintiffs, while acting as trustees, had advanced and become personally liable for over $83,000 for the benefit of the road, a large part of which claim was in existence when the insurance was effected and remained unpaid at the time of the fire. For this they claimed a first lien upon all the property of the road, and the court, in the decree of foreclosure against them, provided for this claim as such a lien, to be discharged from the first earnings of the road. In a suit on the policy it was held—

1. That the foreclosure of the first mortgage and the conveyance of the railroad property by the state treasurer to the new company, constituted such a transfer of the property insured as terminated the insurance under the terms of the policy.

2. That the interest which the plaintiffs had in the property, by virtue of the lien given by the decree for their advancements and liabilities, was a different interest from that which they had held as trustees and which had been insured, and was not sufficient to save the policy from the effect of the transfer. [Two judges dissenting.]

3. That parol evidence was not admissible to show that the insurance, under the description in the policy of the property insured, was really intended to apply to the interest which the plaintiffs had in the property by reason of their advancements and liabilities.

ASSUMPSIT on a policy of insurance, brought to the Superior Court in Middlesex County, and tried to the jury on the general issue, with notice of a claim that the policy had been rendered void by a change of the title and possession of the property insured, before *Martin, J.*

The plaintiffs were trustees of the convertible mortgage bonds of the New Haven, Middletown & Willimantic Railroad Company, by succession to the original trustees under the mortgage, and as such trustees had possession of and were operating the road at the time the policy was issued, which was December 17th, 1874. The policy insured "the trustees of the convertible mortgage of the New Haven, Middletown & Willimantic Railroad Company against loss or damage by fire, to the amount of two thousand dollars, for the period of one year, on their frame freight depot building occupied by them and situated near the corner of Main and Spring streets in the city of Middletown."

The policy contained the following provisions, in different sections:

"If the property be sold or transferred, or any change take place in title or possession, whether by legal process, or judicial decree, or voluntary transfer or conveyance, this policy shall be void."

"If the interest of the assured in the property be any other than the entire, unconditional and sole ownership of the property, for the use and benefit of the assured, or if the building insured stands on leased ground, it must be so represented to the company, and so expressed in the written part of this policy; otherwise the policy shall be void. When property has been sold and delivered, or otherwise disposed of, so that all interest or liability on the part of the assured herein named has ceased, this insurance on such property shall immediately terminate."

Upon the trial the plaintiffs offered the following testimony; it being admitted by the defendants that they were at the time of the insurance and still were an insurance company, incorporated by the legislature of Kentucky, and authorized to make contracts of fire insurance, and record evidence being laid in that the plaintiffs had been duly appointed as trustees on the 21st of February, 1874, in the place of the original trustees under the mortgage, who had resigned; the policy was also laid in and its execution admitted.

A. F. FOWLER. I am an insurance agent. I issued this policy. I examined the property before insuring. When there is any change in the title of the property insured it is my custom to notify the parties that a transfer of the policy is necessary. It has been my custom for years while acting as agent for the Clay Insurance Company. (Evidence of the custom was objected to by the defendants and admitted subject to objection, the defendants excepting.) I knew there was a first mortgage upon the property before the convertible mortgage when I took the risk.

*Cross-examined.* I have been an insurance agent for six years. Acted for defendants till December, 1875, when they withdrew from the state. They had no successor to me here. I paid them in the neighborhood of one thousand dollars. I issued about forty policies. I received instructions from time

to time by letter and from the general agent. I took risks and submitted them to the company. If they accepted they wrote me. I do not know whether I have my letter of appointment; will produce it if I have. My instructions were to find and take risks for the company. I received instructions as to maximum risks, also as to prohibited risks. These are all my instructions. During the six years that I have acted as an insurance agent I have sent notices to parties who have transferred their property that they must get the consent of the insurance company to have their policies continued. I acted as agent for this company from the summer of 1874 till the close of 1875. Most of the risks were taken in the summer of 1875. Don't know of any property which I insured where I gave notice that a transfer of policy was necessary. I can not mention a single instance. It is my custom generally. The trustees of the convertible mortgage were in possession when I took the risk. I heard some talk of a change of possession about the time of the change. I did not give them notice that they must transfer the policy or get it changed. Don't know how I came to forget it.

SHERMAN N. BACON. Am freight agent of the Air Line Railroad in Middletown. Have been for three years last September. I was in charge of the depot all the time, and when the fire took place. The fire was accidental to my belief. Think it was not set on fire. Burned in August, 1875. George H. Bishop was superintendent of the railroad for a time. In December, 1874, he was superintendent, and ceased to be so in August, 1875, the same month as the fire. He had been superintendent all the time from December to August. I saw Fowler around looking at the building. Didn't know him then; know now that he was the man I saw around. Within a week from the time of the fire Bishop ceased to be superintendent. The loss was total, a few boards left only. It was burned about three o'clock in the morning.

*Cross-examined.* Began work Sunday morning three years ago first day of last September. Was employed by the trustees of the N. Haven, Midd. & Willimantic Railroad Company, O. V. Coffin, and W. R. Galpin. Don't know how long I was

in their employ, about a year I should think.   I did not know for whom I worked after that.   I kept right along and got my pay.   Don't know when I commenced to work for Bishop and Camp; worked for them about two years.   I suppose I worked for them up to the time Mr. Turner became superintendent, in August, 1875.   That was the time the present company came in.   Turner came two or three days before the fire took place.   I recognized Turner as superintendent when he came a few days before the fire.   He was superintendent of the Boston & New York Air Line Railroad; Bishop while trustee acted as superintendent also.

JOHN N. CAMP.   I procured a policy of insurance of Mr. Fowler—the policy in question.   The trustees were in possession of the road at the time.   Bishop was superintendent, and continued to be superintendent till Turner came.   While trustees, Bishop and myself made pecuniary advances.   *Question.*—For what purpose did you insure this depot?   (The defendants object to the question and the testimony is admitted subject to the objection, the defendants excepting.)   *Answer.*—Partly because of the advances we were making.   We did not get the insurance till December, late in the year 1874.   Our advances were small at first, but we found the necessities of the road required larger advances, which we were making from time to time.   Bishop and I were not consulted in advance and my consent was not given to the displacement of Bishop by Turner.   I was not asked about it and Bishop was not so far as I know.   I was not in town at the time of the fire.   I was at Martha's Vineyard on my vacation; had been gone but a short time.   I had the management of the finances while we ran the road as trustees, and Mr. Bishop had charge of the running of the road.   On June 8th, 1875, the first deposit was made of money received by me as agent under the state treasurer.   I understood that the agent was in possession by my permission.

*Cross-examined.*   Can't tell how much we had advanced at the time of taking out the policy, about $20,000.   By agreement between Bishop and myself he was appointed superintendent.   I had no notice of his displacement.   Don't know

whether I expected it or not. Yes, I did expect it, because I
was a large owner of the first mortgage, also a director of the
new company at that time. The trustees are prosecuting this
suit. I instructed Mr. Baldwin to bring this suit. About a
month ago the trustees assigned their interest in this insur-
ance to the Air Line Company. When the suit was com-
menced the company owed us a large amount, which has been
paid, and we assigned this to the company. I tried at first to
get the insurance money for ourselves when the suit was
brought; if I had I should have put it in my pocket. I was
afraid I might not get all my claims under the decree paid by
the new company. Some of the parties talked as if they
might not be paid. Our possession as trustees under the
convertible mortgage ended I should say in June, 1875.
Bishop was superintendent afterwards. He kept on. After
we ceased to hold as trustees we acted for Mr. Raymond,
state treasurer. I held on till early in August, 1875. I
think I left Bishop in charge as superintendent when I left on
my vacation. I acted as financier for the state treasurer.
The whole matter was the result of a compromise. At New
Haven we had a consultation; in June, I think. By general
arrangement Bishop and I were to act as agents of the state
treasurer in operating the road. No papers passed between
us in reference to our acting as such agents. We kept run-
ning the road as we had done. I do not know whether we
acted as agents or trustees. I did not know but I should
take possession, for when we gave up possession I understood
from my counsel that we could get possession again any time
in twenty-four hours. About the first thing I did as trustee
was to draw my check, and the second thing the same. The
funds were kept in my name as agent while we acted for the
state treasurer. Before they were kept in my name as
trustee. No other change was made when we acted for him
—no change in the general management, none in the books.
Checks were drawn by " J. N. Camp, agent." I reported to
nobody as agent. I think I made a report of the earnings to
Mr. Hatch of New York, as he represented the first mortgage
bond-holders, and it had been agreed that we should report to

him.   Made monthly reports to him from the time I went in till I got through.   I felt that I was acting for Mr. Raymond as treasurer and myself, and supposed Raymond was in possession liable to be ousted any day.   It was a part of the arrangement that we were to retain possession of the road, that is, the actual possession.   I never received any directions after the decree in relation to the management of the road. I ran the road as agent till about August 1st, 1875.   I went to Martha's Vineyard for my vacation before the fire.   Had ceased to act as agent before going there.

*Direct Examination resumed.*   Our liens were not fully satisfied till about a month ago.   I made a proof of loss soon after my vacation.   Mailed it to the company in one of their long printed envelopes which I got from Fowler.   Afterwards they wrote him they had not received it, and I made out another.   Made it September 28th, 1875.   The second proof was made February 26th.   It was the same as the first.   I considered the new company as in possession by my license. I had a paramount title.

*Cross-examined.*   I never have seen the assignment since I made it.   It assigned all our right, title, and interest in this insurance.

The plaintiffs here rested their case, and the defendants introduced the following testimony:—

WILLIAM E. RAYMOND.   I am treasurer of this state, and was so in the spring and summer of 1875.   (The first mortgage of the New Haven, Middletown & Willimantic Railroad Company to the treasurer of the state and his successors in office is put in evidence and shown to the witness.)   This mortgage was foreclosed by my request in the spring of 1875. No one redeemed under the foreclosure.   I cannot tell when I took possession of the road.   It was in the spring of 1875. I appointed Messrs. Camp and Bishop as my agents to operate the road while in my possession.   After the time limited by the decree of foreclosure for redemption had expired I made a deed to the Boston & New York Air Line Railroad Company, July 8th, 1875.   I never took any actual possession of the road.   Never went upon the road or looked at any of its

books. The arrangement was that I should appoint Messrs. Bishop and Camp my agents.

The defendants laid in the decree of foreclosure in favor of Raymond, as state treasurer, and trustee under the first mortgage, against the plaintiffs as trustees of the convertible mortgage and all other parties in interest, which was passed in May, 1875, and became absolute by the failure of the respondents to redeem, on the fourth Saturday of June, 1875; also the deed of Raymond as treasurer to the Boston & New York Air Line Railroad Company, dated July 8, 1875; and rested their defence.

Certain provisions of the decree claimed by the plaintiff to be important to their case, are as follows:—

And whereas, upon the answer of John N. Camp and George H. Bishop, duly filed in this cause, and a full hearing of all parties thereon, it is found by this court that there was justly due to O. V. Coffin and W. R. Galpin, [to whom the plaintiffs succeeded in their trust] for their services from the 24th day of April, 1873, to the 14th day of February, 1874, as trustees in possession of said railroad, under the mortgage thereof to them, dated the first day of July, 1871, the sum of $2,566.66, and that said Camp and Bishop, on their coming into possession of said road, assumed the payment of the same, and that said sums are justly due at the date of this decree unto the said Camp and Bishop; and that there is also justly due to said Camp and Bishop, for their services as trustees in possession of said railroad, under said mortgage, from the 14th day of February, 1874, to the 4th day of June, 1375, and as superintendents thereof during said period, the sum of $6,645.76; and that there is also due to them for advances made by them while such trustees in possession, the sum of $9,669.55; and that said several sums are equitably chargeable upon all and singular said mortgaged premises as part and parcel of the sums secured by a first lien, as hereinafter is more particularly described and provided. And whereas it is further found by this court that said Coffin and Galpin, while trustees in possession of said railroad, made certain contracts and contracted thereby certain

obligations for the benefit of said railroad, and that said con-
tracts and obligations were necessarily and properly assumed
by said Camp and Bishop, as their successors in said trust,
and now rest upon them; and that said Camp and Bishop,
while in possession of said railroad, have themselves made a
certain contract, and contracted thereby certain obligations
for the benefit of said railroad; and that all and singular said
contracts made by said Coffin and Galpin, and by said Camp
and Bishop, were and are necessary for the proper care, man-
agement and operation of said railroad, and are and ought
to be an equitable charge upon said premises embraced by
and included in the terms of said first mortgage, in the man-
ner and to the extent hereinafter specified; and that the pro-
priety and validity of said charge is assented to by all said
parties to this cause appearing in court.    *    *    *    And
whereas, it is hereby found that there are sundry current
expenses and accounts, heretofore incurred by said Camp and
Bishop, while in possession of said railroad, in the necessary
operation of the same, for running expenses, much of which
is not yet payable, and all of which amount to the sum of
$4,000 as nearly as the same can now be ascertained; it is
hereby further ordered and decreed that the payment of all
said current bills and expenses shall be assumed and made
by said petitioner, to be liquidated out of the next earnings
of said railroad, while in his hands; and that if he fail to
pay and satisfy any of said accounts, forming a part of said
current expenses, estimated at said sum of $4,000, and to
save said Camp and Bishop, and their executors, adminis-
trators and assigns, forever harmless from the same, by
reason whereof they or any of them shall be compelled to
pay the same; then that said sums so by them paid, by reason
of the default of said petitioner, shall be and remain, and
they are hereby declared and adjudged to be, part and parcel
of said first lien hereinafter and hereby ascertained and
declared to attach to said railroad, railroad property, rights
and franchise, prior and paramount to said first mortgage, in
favor of said Camp and Bishop, their executors, adminis-
trators, and assigns, as is next hereinafter provided.    And

upon the several facts and findings hereinbefore set forth, and with the assent of all said parties to this suit appearing in the same and after due notice to all parties in interest, now therefore, in consideration thereof, it is hereby further ordered, adjudged and decreed that the aforesaid charges of said former and present trustees in possession, for services and advances, and said obligations, growing out of said contracts,    *    *    *    which now rest upon said Camp and Bishop, trustees as aforesaid, and were necessarily assumed by them, together with said current labor and expense account, estimated at $4,000; amounting in all to the sum of $83,335.41,    *    *    *    be and are, and they are hereby declared and adjudged to be, a first lien upon said railroad, railroad property and franchises, prior in right to the lien under said first mortgage, and that the title of the said petitioner, William E. Raymond, treasurer of this state, and of his successors in office, in said first mortgage, is and shall forever remain subject to said first lien on said mortgaged premises for the said several sums hereinbefore particularly specified; and that no part of the earnings of said railroad shall be divided among the holders of said first mortgage bonds, or any parties representing or claiming under them, until all and singular said obligations constituting said first lien are fully paid and satisfied; and that said first lien may be enforced against all subsequent incumbrancers, including parties claiming under said first mortgage, by a bill of foreclosure, if deemed necessary, by said Camp and Bishop, and their representatives, heirs, and assigns.

It was proved on the trial, and not denied, that the plaintiffs were in possession of the depot insured, at the time when the policy was issued, through S. N. Bacon, an employee in charge of the depot. It was also proved, and not denied, that the plaintiffs were not themselves personally, or either of them personally, in the immediate possession of the depot at the time of the fire, or for two or three days preceding the fire, and that no one who was then employed by them was in possession. But it was proved, and not denied, that said Bacon had continued in charge of the depot, in the same

manner as when the policy was issued, down to the time of the fire, except that for two or three days before the fire he was acting under the new Air Line Company and as their employee. Upon these facts the defendants requested the court to charge the jury that, to make the policy void, it was only necessary that a change should take place before the fire in the possession of the building insured, and that if the building at the time of the fire on August 18th, 1875, was not in the possession of the plaintiffs as trustees of the convertible mortgage, or if any change had taken place in the possession of the building insured after the insurance was effected and before the fire, the plaintiffs could not recover. But the court declined to give such instruction.

The jury having rendered a verdict for the plaintiffs the defendants moved for a new trial on the ground that the verdict was against the evidence in the case, and for error in the rulings of the court and in the refusal to charge as requested by the defendants.

The case was argued at a former term of the court, and re-argued at the present term by direction of the judges.

*F. Chamberlin* and *E. S. White*, in support of the motion.

1.    The verdict was manifestly against the evidence, for the evidence proved a change of title. A condition of the policy provides that it shall be void if *any* change takes place in the *title* of the property insured by legal process or judicial decree, or voluntary transfer or conveyance. The word "property" may have different meanings, dependent upon the connection in which it is used, but in this connection, as is well settled, it is used to designate "*the thing* insured, and not the *interest of the assured* in that thing." May on Ins., § 283; *Springfield Ins. Co.* v. *Allen*, 43 N. York, 389, 395; *Savage* v. *Howard Ins. Co.*, 52 id., 505, 508; *Monadnock R. R. Co.* v. *Manufacturers' Ins. Co.*, 113 Mass., 77. The question therefore is, "Did any change take place in the title of the depot in any of the modes named in this condition?" The undisputed facts necessarily bring us to an affirmative reply; for, when this policy was issued, the New Haven,

Middletown & Willimantic Railroad Co. held (subject to the first mortgage to the state treasurer, and the second to the plaintiffs) *the title*—the right of property or ownership—of this depot. But before the fire, the *title* to this depot by successive processes of judicial decree and voluntary conveyance had passed from the railroad company and from the plaintiffs to the state treasurer, and from the state treasurer to the Boston & New York Air Line Co., which, at the time of the fire, held the title and ownership of the depot insured, subject only to the lien of Bishop and Camp. This condition of insurance policies has been often the subject of judicial interpretation, and in discussing it in *Savage* v. *Howard Ins. Co.*, 52 N. York, 506, the Court of Appeals say: "The condition found in these policies has been held, *whenever it has come before the courts*, to prohibit the sale or transfer of the property, and a change of title has been held to work a forfeiture of the policy." They add: "It is by no means *a forfeiture or penalty or in the nature of a forfeiture*. The parties have determined by their agreement the conditions of the liability and the extent of the obligations of the insurers, and they can only be held liable in accordance with the terms of the agreement and within the conditions of the obligation." And on page 508 of the same case, the court say: "It is sufficient to put an end to the policy that there has been a change in the title, and no one can say that a conveyance of the fee, and substituting the interest of a mortgagee in the property insured, is not a substantial change in the title. But the sale or transfer of the property was complete and absolute, and *the retaining a lien* for the purchase money, either in the form of a mortgage or otherwise, did not change the character or effect of the conveyance." See also *Perry* v. *Lorillard Fire Ins. Co.*, 61 N. York, 214; *Keeney* v. *Home Ins. Co.*, 3 Thomp. & Cook, 478; *Langdon* v. *Minnesota Farmers' Ins. Asso.*, 22 Minn., 193.

2. The verdict is also against the evidence because the evidence proved a change of possession. By the same condition of the policy a change of *possession* rendered it void. When the policy was issued, as the evidence clearly shows,

Bishop and Camp, as "trustees of the convertible mortgage," were in possession.   In June following they were succeeded by the state treasurer, and before the fire he was succeeded by the  Boston & New York Air  Line Co., which was in  possession when the fire occurred.   The  possession intended  by the policy was the *legal* possession.   If not, the policy would be avoided by every change of tenant.   The foreclosure proceeding of the state treasurer, when completed, carried with it a *legal* change of possession, and the subsequent deed from him to the Boston & New York Air Line Co. also carried with it such legal change of possession.   These changes of possession are clearly within the prohibition of this condition of the policy.

3.    Also because the evidence proved a termination of all the interest of the assured.   The fifth condition of the policy provides that the insurance shall terminate when the property has been sold or otherwise disposed of, so that all interest of the insured has ceased.   The policy in suit insured "*the trustees* of the convertible mortgage against loss or damage by fire, on their frame freight depot building occupied by them;" and Bishop and Camp are not named *individually* in the policy. The  decree of  foreclosure cut  off and  extinguished all  title and interest of the trustees after the fourth Saturday of June, 1875, and on that day the title of the state treasurer became absolute and  perfect against all the world.   By the decree a right of lien in favor of " Bishop and Camp " for expenses, advances, and  services while they had been trustees, was established, and it was therein " *decreed* that the payment" of such advances, expenses, and services be "*assumed and made by the petitioner*" in said foreclosure proceedings, "to be liquidated out of the next earnings of said railroad *while in his hands*."   The court estimate the amount due Bishop and Camp, for advances, expenses, and services as trustees "*while in possession of said railroad*, under said mortgage, *from the 14th day of February*, 1874, *to the 4th day of June*, 1875, *and as superintendents thereof during said period*," certain sums, amounting, including interest, to $83,335.41, and then " *declare and adjudge* the same to be a first lien" upon

the property. Their lien is *created* by this decree, and did not exist before; it consisted of a variety of items, of such nature that the trustees had an equitable claim upon the estate for their payment and reimbursement; and the court, in the foreclosure proceedings, adjudicated upon those claims, and found that they had such equity as was a proper basis for decreeing in favor of Bishop and Camp a lien upon the estate. As trustees their work is done and their accounts settled, and possession is to pass to prior mortgagees. The decree does not authorize the trustees or Bishop and Camp personally to take possession of the property and manage it and *work out* this lien, but the amount is "to be paid *while it shall be in their possession*, by the parties who, *by the change of title*, are to become the owners of the estate.*"* As to a termination of the interest of the insured, the legal effect of the decree is the same as it would be had all the respondents voluntarily released to the first mortgagee all their rights and interest in the road, and the first mortgagee had then in some proper legal way given to Bishop and Camp individually security for the amount of their advances.

4. The court erred in admitting, against the defendants' objection, evidence of the agent's custom, when there was a change in the title of property insured, to notify the parties that a transfer of the policy was necessary. Such evidence was irrelevant and inadmissible, for custom cannot be given in evidence to vary or control an express contract. 2 Greenl. Ev., § 252, note, and cases there cited; *Mutual Safety Ins. Co.* v. *Hone*, 2 Comst., 241, 244. In the case of *Burger* v. *Farmers' Mutual Ins. Co.*, 71 Penn. S. R., 422, where the charter of the company contained a clause similar to the one under consideration, the court held that evidence tending to show a custom on the part of insurers to permit such transfers to be made, was immaterial. In *Stebbins* v. *Globe Ins. Co.*, 2 Hall's Superior Ct. R., 632, the defendants offered evidence of a usage on the part of persons insured, to give notice of any increase of risk, and it was held inadmissible to control the legal effect of the policy.

5. The court erred in admitting, against the objection of

the defendants, evidence of the plaintiffs' purpose in insuring the building.   This evidence was wholly irrelevant, for the plaintiffs' rights upon this contract of insurance were fixed by the terms of the policy, and could not be varied by their motive or purpose in procuring it.

6.   The court should have charged the jury, as to the effect of a change of possession, substantially as claimed by the defendants.   By the first condition of the policy any change in title or possession rendered it void.   The plaintiffs claimed that there had not been any change of title within the meaning of this condition, because of the lien fixed by the foreclosure decree.   The facts proved and not denied clearly showed that there had been a change of possession. And the object of this request was to have the jury instructed that the policy was rendered void, and the plaintiffs' right of recovery defeated, by a change of possession only.   In the case of *Keeney* v. *Home Ins. Co.*, 3 Thomp. & Cook, 478, one partner brought an action to dissolve the firm, and was himself appointed receiver; upon a loss occurring before a sale was made, it was held to be such violation of a condition, similar to the one under consideration, as released the insurers.   That was a mere change of possession from a partnership to one partner as receiver.

*S. E. Baldwin*, contra.

1.   The plaintiffs had a two-fold relation to the property : *first*, a mortgage title, vested in them on a naked trust for the second mortgage bondholders; and, *second*, a lien for their own benefit, by virtue of services rendered and advances made in the administration of their trust.   They could insure themselves in either or both of these relations.   *Carruthers* v. *Sheddon*, 6 Taunt., 14, 17, 19; *Holbrook* v. *American Ins. Co.*, 1 Curtis C. C., 193, 199.   It was the latter interest which the insurance was designed to protect—an interest unimpaired at the time the suit was brought.   The defendants' agent, in drawing up the policy, has indeed failed to express this object with precision.   On any theory of the case, the description of the subject matter insured is obviously

inexact.  The building was owned by the railroad company, subject to a first mortgage to the state treasurer, and a second mortgage to the plaintiffs, as trustees, and also to their own equitable lien.  The mortgagee has a mere lien on the mortgaged property, and a second mortgagee a mere lien on the equity of redemption in the mortgaged property.  *Colwell* v. *Warner*, 36 Conn., 234.  In no ordinary sense, therefore, could the depot in possession of Bacon, under the plaintiffs, be called, as it is in the policy, "their frame freight depot building, occupied by them."  But what both the plaintiffs and defendants really intended to insure, and to describe in the policy, was the lien of the plaintiffs, acquired while trustees, and by virtue of their acts as such, upon the depot building, which they claimed to be a first lien.  In this view the depot might well enough be termed "theirs;" and so both parties agreed to treat it in the policy.  *Peck* v. *New London Mut. Ins. Co.*, 22 Conn., 575, 585; *Clinton* v. *Hope Ins. Co.*, 45 N. York, 454, 461.  The language of the policy, which follows this descriptive part, confirms this view: "And the said company hereby agrees to make good unto the said insured, their *executors, administrators and assigns*, all such loss or damage, not exceeding in amount the sum insured, nor the *interest of the assured in the property*, except as herein provided, as shall happen by fire to the property so specified." It was not an insurance for the benefit of the trust estate, but for the parties then holding the trust estate, and to whom the trust estate was indebted; otherwise the policy would have run to the plaintiffs and their successors in the trust, not to the plaintiffs and their "executors, administrators and assigns."  The premium, even, does not appear to have been paid out of the trust estate.  If the loss had been paid when due, the plaintiffs would have appropriated the money, at once, to re-imburse themselves.  Our declaration sets up this lien as what we meant to insure.  In it we say that they, "as such trustees, had *an interest* by virtue of said mortgage, *and their services, acts and claims as trustees under the same*, in and to all property covered by said mortgage;  *   *   and the plaintiffs say that they applied to the defendants to insure

said building, *and their interest therein,* against fire; and that the defendants had full notice then and there of all the matters aforesaid, and agreed to give such insurance to the plaintiffs as trustees,   *   *   and *did insure the plaintiffs, therein described, &c.*" The verdict is right if these allegations were justified. Indeed, were it necessary, the words "trustees of the convertible mortgage, &c.," should be held to be a mere *descriptio personœ.* This equitable lien, which both parties understood the insurance was to cover, was never alienated or discharged, until after the loss, and after this suit was begun. Like the policy, it was in favor of the plaintiffs, their executors, administrators and assigns, a vested estate, defeasible only by full payment under the decree, and a release deed duly executed.

2.   But even were it true that the parties intended to insure the trustees for the sole and direct benefit of the trust estate, and that their interest or title, alluded to in the policy, was simply their necessary legal interest or title under the mortgage, the evidence would still show no such change of title as could defeat the policy. Such a change must be a change in the *plaintiffs'* title. If a mortgagee insures his interest, no sale of the property by the mortgagor can affect the insurance. But the title of the plaintiffs was improved, rather than impaired, by the decree of foreclosure; and the acquisition of a superior title is not such a change as the condition in the policy contemplates. All parts of the policy must be construed together, and, thus taken, the fifth condition qualifies and explains the more general language of the first. The *letter* of the first condition would avoid a policy in favor of an owner of mortgaged property, if he were to pay up the mortgage, and thus change his title by disencumbering it; but its *spirit* could not be, as the fifth condition clearly shows, by providing that the policy shall be avoided "when the property has been sold and delivered, or otherwise disposed of, *so that all interest* or liability on the part of the assured herein named has ceased." If the terms of these two conditions cannot thus be reconciled, then that of the fifth, being that least favorable to the party which dictated

the policy, must prevail. And actually there was no time when "all interest on the part of the assured" ceased. The only thing affecting their title was the foreclosure. This did not take effect until June 26th, 1875, and on June 4th the lien of the plaintiffs for their services, advances, &c., was decreed to be "a first lien, prior in right to the lien under said first mortgage." From June 4th to June 26th therefore, they had two liens; but after June 26th they retained, under any view of the case, at least one, and that the first lien. Not only was the lien, which they had before claimed, now allowed by a competent court to be good against all parties in interest, but their title was distinctly declared to be superior to the foreclosure title of the state treasurer. The reason of providing for an avoidance of a policy if the title is changed, is because impairing one's title impairs his interest in preserving the property from risk. But where the title is changed for the better, neither the reason nor the condition can apply. The title of the plaintiffs, at the time of the fire, was an "absolute title," since they could not be deprived of it without their consent, and it rested on a final judicial decree. *Hough* v. *City Fire Ins. Co.*, 29 Conn., 10, 20. The terms of the indorsement in large type, on the back of the policy, in regard to the form of assignments of the policy, also go to show that the term "transfer of title" was regarded as importing an "actual sale." *Stetson* v. *Mass. Mut. Ins. Co.*, 4 Mass., 330; *Strong* v. *Manufacturers' Ins. Co.*, 10 Pick., 40, 44; *Van Deusen* v. *Charter Oak Fire Ins. Co.*, 1 Rob. (N. Y.,) 55, 64; *Hoffman* v. *Ætna Ins. Co.*, 32 N. York, 405, 415; *Phœnix Ins. Co.* v. *Lawrence*, 5 Metc. (Ky.), 9, 16; *Hartford Fire Ins. Co.* v. *Walsh*, 54 Ill., 168; *Power* v. *Ocean Ins. Co.*, 19 Louis., 2, 28; *Ayers* v. *Hartford Fire Ins. Co.*, 17 Iowa, 176, 184; *West Branch Ins. Co.* v. *Helfenstein*, 40 Penn. S. R., 289; *Burnett* v. *Eufaula Home Ins. Co.*, 46 Ala., 11, 14; *Bragg* v. *N. England Mut. Fire Ins. Co.*, 25 N. Hamp., 289. If a pledge by a married woman is held not to be a "transfer" under our statute (Gen. Stat., p. 187, sec. 4,) this foreclosure decree cannot amount to one. *Robertson* v. *Wilcox*, 30 Conn., 426, 431; *Padbury* v. *Garlick*, id., 384.

3.   There was no. such change of possession as can defeat the policy.   The building remained throughout in the actual possession of Bacon, the local freight agent, and was used in the same way from the date of the policy to the fire.   The object of this condition in fire policies is to prevent a change of occupancy which increases the risk.   This is fully expressed in the first part of the first condition, which provides for the avoidance of the policy if the insured "premises shall be occupied or used so as to increase the risk, or become vacant or unoccupied, and so remain for more than thirty days," &c.; and this language qualifies and limits the generality of the subsequent provisions as to "any change" in possession.   As the actual possession of the depot remained always in the hands of Bacon, it was immaterial what representative of the owners of the road had the nominal possession of the road as a whole, at the time of the fire.   *Commonwealth Ins. Co.* v. *Berger,* 42 Penn. S. R., 285; *Phœnix Ins. Co.* v. *Lawrence,* 4 Metc. (Ky.), 9.   The plaintiffs were recognized by the first mortgage trustee as in possession on July 8th, nearly two weeks after the foreclosure.   They themselves regarded the control of the road as in their hands at this time, and Raymond as nominally in possession by their license.   The defendants knew, when the policy was issued, that the parties claiming under the first mortgage had *primâ facie* an immediate right to dispossess the insured.   *Washington Ins. Co.* v. *Hayes,* 17 Ohio S. R., 433, 437.   We submit, also, that the change in title or possession, meant by the policy, is limited to a change in three ways, two involuntary and one voluntary; namely, first, by legal process; second, by judicial decree; third, by a voluntary transfer or conveyance.   The two latter ways seem only appropriate to a change of *title;* the word "conveyance" explaining the word "transfer" as meaning a written transfer.   *Robertson* v. *Wilcox,* 36 Conn., 429, 431.   If this construction be correct, then, as the decree of foreclosure did not provide for any change of possession, and as the plaintiffs were not ejected by any legal process, nor ever made any voluntary written transfer or conveyance, there was no change of possession within the

terms of the policy. *Insurance Co.* v. *Slaughter*, 12 Wall., 404. But, if we were to assume that a voluntary transfer of possession, by word or act, would be enough to defeat the policy, the jury were justified in finding that there was no such transfer by the plaintiffs. This they must have found, because they were distinctly charged that if the plaintiffs "voluntarily went out of possession, and consented to yield up the possession of the depot to the new company, then this would be a change of possession which would be sufficient to defeat their recovery." A verdict for the plaintiffs, after this charge, necessarily imports a finding that they did not voluntarily transfer the possession. Even if, again, an involuntary change of possession, otherwise than by legal process, could defeat the policy, such a result could not follow until the plaintiffs had had a reasonable time to re-possess themselves. And this reasonable time, the jury have found that the plaintiffs did not have. *Hough* v. *City Fire Ins. Co.*, 29 Conn., 10, 24; *Boynton* v. *Farmers' Ins. Co.*, 43 Verm., 256, 260. The charge on the point of possession, which the defendants requested, was plainly improper, and therefore rightly refused. A momentary change of possession, by which it was lost one day and regained the next, would avoid a policy under the law as thus claimed, although the parties insured might have used all diligence to re-instate themselves in possession, and have been in possession at and long before the time of the fire. Both these conditions as to changes in the title or possession are provisions for forfeitures, and should be construed strictly against the framers of the policy. *Boon* v. *Ætna Ins. Co.*, 40 Conn., 586; *Brink* v. *Merchants' & Mechanics' Ins. Co.*, 49 Verm., 442.

4. The question is not whether this court might upon the evidence have reached a different conclusion from that of the jury. The verdict cannot be set aside unless manifest injustice has been done, and the wrong is so plain and palpable as to exclude all reasonable doubt of its existence, and clearly to denote that some mistake has been made by the jury in the application of legal principles, or to justify the suspicion of corruption, prejudice, or partiality. *Waters* v. *Bristol*, 26

Conn., 404; *Daley* v. *Norwich & Worcester R. R. Co.*, id., 591. The fact that Mr. Bishop, who was the superintendent of the road when the policy was issued, and in possession of it by appointment of himself and Mr. Camp as co-trustees, continued in possession after the foreclosure, nominally and by a species of legal fiction as a co-agent with Mr. Camp of the state treasurer, impaired no right of the defendants. The risk was not increased, nor the use changed, nor the possession of the depot-agent interfered with, at any time before the fire. The title of the plaintiffs, and their right to reimbursement for those advances which led them to insure, were strengthened by the foreclosure decree. The new company came in two or three days before the fire indeed, but the plaintiffs' lien and right to regain their possession remained in full force. The defendants have met precisely the loss, the risk of meeting which was the consideration of the insurance premium. It would be "manifestly unjust" if they evaded paying for it. This is peculiarly a case for applying the rule that granting a new trial is a matter of discretion, and will never be done where the verdict is consistent with the justice of the case. *Johnson* v. *Blackman*, 11 Conn., 358; *Stone* v. *Stevens*, 12 id., 226; *Sheldon* v. *Conn. Mut. Life Ins. Co.*, 25 id., 207, 223.

5. The evidence of the custom of the defendants to notify parties insured, in case of a change of title, that there must be a transfer of the policy, was not irrelevant. If there was such a custom the plaintiffs were entitled to rely on it, provided it was universal. The charge of the court carefully limited the effect of the evidence. Mr. Fowler was the general agent of the defendants, and his custom when acting in their behalf, if of the character thus required by the charge, was the defendants' custom. *Viele* v. *Germania Ins. Co.*, 26 Iowa, 9; *Franklin* v. *Atlantic Fire Ins. Co.*, 42 Misso., 459 And such a custom, if found by the jury to have existed, of itself justified the verdict. *Leslie* v. *Knickerbocker Life Ins. Co.*, 2 Hun, 616.

6. It was not irrelevant to show the purpose for which the plaintiffs insured the depot. Insurance by trustees,

factors, or other representatives of third parties, must generally be explained by similar testimony, to secure the full benefit of the policy. Had the convertible mortgage been fully paid off before the fire, or had there been a change of trustees under the second mortgage, the plaintiffs would still have retained an insurable interest by reason of their advances and services. The second mortgage on this road was practically worthless, the property being notoriously insufficient to satisfy the first. The real gist of the transaction was an insurance of the plaintiffs' lien on the depot for their advances and services. *King* v. *State Fire Ins. Co.*, 7 Cush., 7; *Waters* v. *Monarch Ins. Co.*, 34 Eng. L. & Eq., 116; *De Forest* v. *Fulton Fire Ins. Co.*, 1 Hall, 84; *Lee* v. *Adsit*, 37 N. York, 89; *Globe Ins. Co.* v. *Boyle*, 21 Ohio S. R., 128; *Insurance Co.* v. *Chase*, 5 Wall., 509. This was the ground of recovery which we declared on. If the defendants thought it variant from the policy, they could have demurred; but they cannot prevent us from proving our allegations under the general issue. *Adams* v. *Way*, 32 Conn., 160.

PARDEE, J. This is an action upon a policy of insurance against loss by fire. The plaintiffs had a verdict; the defendants filed a motion for a new trial for alleged errors on the part of the court in the admission of evidence and the refusal to charge as requested; also a motion for a new trial for a verdict against evidence. The plaintiffs have filed a bill of exceptions (under the statute) based upon the refusal of the court to charge the jury that the decree of foreclosure hereinafter mentioned did not work any such change in the title of the plaintiffs as can impair their rights under the contract.

In 1874 the holders of the convertible bonds issued by the New Haven, Middletown & Willimantic Railroad Company, and secured by a second mortgage, were in the possession and use of the real and personal property of that corporation, and were operating the road through the agency of George H. Bishop and John N. Camp, the plaintiffs, who were the successors of the persons named as trustees in the mortgage deed; and, in particular, were in the possession and use of the freight depot in Middletown.

On December 17th, 1874, these trustees obtained insurance against loss by fire from the defendants; the contract containing the following words: "do insure the trustees of the convertible mortgage of the New Haven, Middletown & Willimantic Railroad Company against loss or damage by fire to the amount of $2,000, for the period of one year, on their frame freight depot building occupied by them and situated near the corner of Main and Spring streets in the city of Middletown, Ct."

In May, 1875, the holders of another series of bonds issued by the railroad company, and secured by the first mortgage upon its property, obtained a decree of foreclosure upon a petition in which the corporation, the holders of the convertible bonds, and all other persons having any interest in the property, were made respondents. These were to redeem on or before the fourth Saturday of June, 1875, or be forever thereafter barred and foreclosed. They did not redeem; and the treasurer of the state of Connecticut, who had been named as trustee in the mortgage deed, in behalf of the *cestuis que trust*, took possession of said property, including said freight building, and for their benefit operated the road, appointing the plaintiffs as his agents in executing his trust, until July 8th, 1875, when he conveyed the property by deed to the Boston & New York Air Line Railroad Company; the General Assembly of this state having at its May session, 1875, incorporated by that name the bondholders for whom he held the trust. Thereupon the last named corporation went into the possession and use of said property, including said building, and for itself operated the road; the agency of the plaintiffs in respect to the road ceasing on August 1st, 1875. This freight building was destroyed by fire on the 14th day of August, 1875, at which time it was in charge of an agent appointed by the Boston & New York Air Line Railroad Company.

The contract of insurance upon which this suit is brought provides in the first section that "if the property be sold or transferred, or any change take place in title or possession, whether by legal process or judicial decree or voluntary

transfer or conveyance, * * this policy shall be void;" and in the fifth, that "when property has been sold and delivered or otherwise disposed of, so that all interest or liability on the part of the assured herein named has ceased, this insurance on such property shall immediately terminate." When the policy was executed, the New Haven, Middletown & Willimantic Railroad Company held the equity of redemption subject to the two mortgages; bondholders secured by the second mortgage, under an arrangement with those secured by the first, were in the actual possession and use of the building; the contract was to insure it as their property; before the loss occurred a judicial decree extinguished the title previously held thereto either by the railroad company or the convertible bondholders; title, right to possession, and possession, had passed to the first bondholders, and from these last by voluntary conveyance to a new corporation; and this without notice to or consent of the defendants. Precisely that had occurred which both parties had stipulated should make void the contract of insurance. As a general law governing human conduct, owners of property are presumed to use some degree of care in protecting it; the insurers made this law their ally by providing that during the life of the policy the insured should preserve some right in or to the property, and thus be interested in guarding it from destruction by fire; when the judicial decree entirely divorced them from it, its preservation or loss became alike immaterial to them. Thus, the vital condition of the contract was broken, and the court should have instructed the jury that, the foregoing facts being proven, the plaintiffs were not entitled to maintain their action; and this, irrespective of the fact that the insurers knew when they issued the policy that the insured were second mortgagees. The willingness of the defendants to insure the plaintiffs in their qualified equitable interest does not bind them to stand as their insurers when they have ceased to have any interest at all.

After the holders of the second mortgage bonds had taken possession of the property, the plaintiffs, being successors of the trustees named in the mortgage, managed the road; while

performing this service, they as individuals advanced money and assumed obligations for its protection and maintenance to the extent of more than eighty thousand dollars. In the decree of foreclosure hereinbefore mentioned this indebtedness was recognized, and by agreement between them and the other parties in interest payment thereof was secured by making it a lien upon the property to take precedence of the first mortgage, to be discharged from the first earnings of the road. Accepting the claim of the plaintiffs that their advancements became as matter of law the first lien upon the property from the moment they were made, such lien was to them in their individual capacity; their interest as lienors was wholly distinct in origin from that of the convertible bondholders; either one could have been destroyed without affecting the other; and we are unable to find in the language of the contract insuring the title of "the trustees of the convertible mortgage of the New Haven, Middletown & Willimantic Railroad Co.," inclusion of or protection for any interest which the plaintiffs as individuals might have had in the building. Moreover, they made their advancements solely upon the credit of the property in their keeping, and not at all upon the personal credit of the unknown and ever changing body of holders of coupon bonds transferable by delivery; these had assumed no personal obligation to them; and when these were foreclosed and barred from all ownership the plaintiffs followed the property, and obtaining from the court a first mortgage of record thereon, accepted that as the security for their loan; from that time onward these foreclosed bondholders not only had no right, title or interest in or to the property, but no responsibility for the plaintiffs' personal advances; it was quite immaterial to them when or how these were repaid; for being repaid the first mortgagees had the property; and not being paid the plaintiffs as individuals took it. The second bondholders had no insurable interest remaining in them.

Again, the plaintiffs argue that parol evidence is admissible for the purpose of showing that they insured their individual, personal interest in the building, upon the principle that

trusters, factors, and other representatives of third parties, must thus explain, in order to secure the benefit of their policies.

Whenever insurers take risks upon property in the keeping of a factor without requiring the name of the owner, or in the possession of a trustee without requiring the name of the *cestui que trust*, or an interest in a representative name without a specific description as to the ownership, they contract to subject themselves to the admission of parol evidence for the purpose of determining the person to receive indemnity if loss occurs.   But, in the case before us the defendants did not insure the plaintiffs as trustees in general terms and leave to parol evidence to point out the *cestui que trust;* they required and received an explicit declaration from the plaintiffs that they desired the insurance in their capacity as trustees for the convertible bondholders, and that it was the interest of these last in the property which they sought to protect; and the plaintiffs accepted the contract wherein it was thus written, written with such particularity and distinctness as to give no place for doubt.   The parol evidence offered for the purpose of eliminating from the contract the name of the party for whose benefit it was expressly made and substituting another, should have been rejected.

Upon the trial the plaintiffs offered evidence for the purpose of showing that it had been the custom of the agent who issued the policy to notify, in behalf of the defendants, persons insured that a change of title would necessitate a transfer of the policy, and that this had been inadvertently overlooked in the present case.   The defendants objected, but the court admitted it.   The agent testified that he had acted for the defendants from the summer of 1874 to the close of 1875, but could not mention an instance of such notice. This evidence falls short of establishing the existence of a custom having the qualities of uniformity and universality in the degree necessary to enable it to support the presumption that this contract was made in subservience to it, and to override precise written stipulations.   The verdict based upon it must be set aside.

A new trial is granted.

In this opinion PARK, C. J., and LOOMIS, J., concurred. CARPENTER and GRANGER. Js., dissented.


CARPENTER, J.   I am not able to concur in the conclusion to which a majority of the court have come in this case.

The property insured by the policy upon which this suit is brought formerly belonged to the New Haven, Middletown & Willimantic Railroad Company.   All the property of the company was subject to two mortgages, the first to the state treasurer to secure certain bondholders, and the second to trustees to secure other bonds called convertible or second mortgage bonds..   The trustees took possession of the road and all its property under the second mortgage.   The policy in suit was issued to the trustees in December, 1874, by which the freight depot in Middletown was insured.   At that time the trustees were operating the road nominally for the benefit of the second mortgage bondholders.   In June, 1875, the first mortgage was foreclosed.   That decree extinguished the right of the bondholders under the second mortgage, but the claim of the trustees for expenses incurred in operating the road, making repairs, &c., was not foreclosed.   It was agreed by all parties interested that such expenses, amounting to over $83,000, should be regarded as a lien upon all the property of the company, and should take precedence of the first mortgage, and it was so provided in the decree.   After the decree became absolute the state treasurer took possession of the road in the interest of the holders of the first mortgage bonds, and appointed the plaintiffs to superintend and manage its affairs.   On the 8th of July, 1875, the road and all its appurtenances were sold to the Boston & New York Air Line Railroad Company.   The plaintiffs continued to manage the road until August, when, without their consent, and without their previous knowledge, they were displaced and one Turner was appointed superintendent.   A few days later, August 14th, 1875, the building insured was totally destroyed by fire.   Upon these facts the jury returned a verdict for the plaintiffs. The defendants insist that the verdict should be set aside, as

being against the evidence in the cause, for two reasons, first, that the evidence shows that there had been a change of title to the property, and second, a change of possession; either of which it is claimed rendered the policy void.

Let us examine those reasons.

1. Title. It is not denied that the plaintiffs at the time the policy issued had an insurable interest in the property insured. We will notice particularly what that interest was, and that will assist us in determining whether there has been any change. They did not insure as individuals, but as trustees. As such they had the possession and use of the road and all its property, including the depot building, insured. All the receipts and income from the property constituted a fund in their hands, which they held in trust, not merely for the holders of the convertible bonds, but for other purposes. There are three classes of creditors who have a possible interest in this fund:—1st. Those having claims for expenses and repairs. 2d. The holders of the first mortgage bonds; and 3d. The holders of the convertible bonds. These do not stand upon an equal footing. The first must be paid in full before anything can be paid to the second or third; and the interest on the first mortgage bonds must be paid in full before anything can be paid on the second mortgage bonds. Inasmuch as, during the lifetime of this policy, the expense account exceeded the entire income by more than $83,000, it is obvious that neither class of bondholders had any real interest in this fund, for the reason that it was not sufficient to reach either class. The plaintiffs, therefore, in reality, were trustees for the first class alone; and the insurance in the interest of this fund is really in the interest of these creditors. Thus it will be seen that these plaintiffs represent parties entirely distinct from either class of bondholders, and are not in reality trustees for the bondholders at all so far as this fund is concerned or this insurance. The parties represented by the plaintiffs are entitled to a priority in point of right, not only in the income of the trust property, but also, in equity, in the trust property itself. This right was distinctly recognized by the first mortgagees, and it was

provided in their decree of foreclosure that these claims should be a first lien upon the entire property.

The plaintiffs therefore, as trustees in a limited or qualified sense, as above explained, might with propriety insure this building for the benefit of those claims; but if otherwise, and they are to be regarded as trustees in a broader sense—representing the bonds as well as these claims—still the result would be the same. The extinction of the claims of the mortgagees will not vitiate the insurance so long as the claims of other parties remain good. Whether the insurance money when collected is payable to one person or another is a matter of no concern to these defendants.

My conclusion therefore is that the interest or title of the plaintiffs remained at the time of the fire substantially as it was at the time the policy issued.

Another inquiry in this part of the case is, whether any change of title in other parties concerned will vitiate the policy.

There are two clauses in the policy which should be considered in this connection. The first is found in the first condition, and reads as follows:—"Or if the property be sold or transferred, or any change take place in title or possession, whether by legal process, or judicial decree, or voluntary transfer or conveyance, this policy shall be void." I think this clause has reference to the thing insured; whether it is the property itself, as where the insured has the absolute title, or an interest in the property less than a complete title. In either case the insurance, if the property insured, whatever it is, is sold, or if in any other manner the insured is divested of his title, becomes void. In the present case no such change has taken place.

I think this clause has no reference to any title or interest which other parties may have in the property. If so no change in such title or interest will operate under this clause to defeat the policy. In respect to possession it may be different, especially if the change of possession materially affects the risk.

The second clause is in the fifth condition, and is as fol-

lows:—" If the interest of the assured in the property be any other than the entire, unconditional and sole ownership of the property, for the sole use and benefit of the assured, or if the building insured stands on leased ground, it must be so represented to the company, and so expressed in the written part of this policy, otherwise the policy shall be void. When property has been sold and delivered, or otherwise disposed of, so that all interest or liability on the part of the assured herein named has ceased, this insurance on such property shall immediately terminate." This whole section taken together seems to have a direct application to the present case. The interest of the assured in the property is less than the "entire, unconditional and sole ownership;" and by clear implication any conveyance or disposition of the property, which does not terminate the interest of the assured, does not affect the policy. There has been no conveyance or disposition of this property which impairs the interest of the plaintiffs. There is nothing therefore in this provision of the policy which makes it void.

2. Was there a change of possession? The plaintiffs remained in possession as trustees until June, when the state treasurer took possession under the first mortgage. He appointed the plaintiffs his agents to operate the road, and as such they were in possession until July 8th, when the road was sold to the Boston & New York Air Line Railroad Company. After the sale they continued operating the road as before until August. Early in August they were displaced and one Turner was appointed superintendent in their stead, but without the knowledge or consent of the plaintiffs. In a few days after this change was made the fire occurred.

The instruction to the jury was of such a character that they found, and I think, upon the evidence, properly found, that the possession of the plaintiffs under the state treasurer and under the new corporation, was a continuance of their possession, or at least that it was not such a change of possession as affected the policy. Mr. Camp, one of the plaintiffs, testified as follows on this point:—"Our possession as trustees under the convertible mortgage ended, I should say,

in June, 1875.   Bishop was superintendent afterwards.   He kept on.   After we ceased to hold as trustees we acted for Mr. Raymond, state treasurer.   I held on till early in August, 1875.   I think I left Bishop in charge as superintendent when I left on my vacation.     *     *     By general arrangement Bishop and I were to act as agents of the state treasurer in operating the road.     *     *     We kept running the road as we had done.   I don't know whether we acted as agents or trustees.     *     *     The funds were kept in my name as agent while we acted for the state treasurer.   Before they were kept in my name as trustee.   There was no other change when we acted for him, no change in the general management, none in the books."

Taking all this evidence together I think he meant that their trusteeship for the holders of the second mortgage bonds ended in June.   Their interest as trustees in respect to the expense account manifestly continued.   I think it is equally clear that they did not intend to relinquish any security they held for the payment of those claims.   The jury therefore might fairly presume that they intended to retain possession to protect their interests in that behalf.   There was no conflicting evidence and I think the action of the jury cannot be complained of.

In respect to the appointment of Turner as superintendent, the jury were told " that if they found that the plaintiffs were unlawfully and forcibly displaced by the Boston & New York Air Line Railroad Company, and were thus temporarily put out and kept out of possession of the depot by force and against their mind and will, their remaining out of possession for a short time would not necessarily make them out of possession within the meaning of the policy; but that if they voluntarily went out of possession, and consented to yield up the possession of the depot to the new Air Line Company, then this would be a change of possession which would be sufficient to defeat their recovery."

Under this charge the jury must have found that the plaintiffs were " temporarily put out and kept out of possession of the depot, by force and against their mind and will."

There was some evidence at least to support this finding, and there was little or none to show that they "voluntarily went out of possession, and consented to yield up the possession, &c." Mr. Camp testified thus:—"Bishop and I were not consulted in advance and my consent not given to the displacement of Bishop by Turner. I was not asked about it and Bishop was not so far as I know." Again, on the cross-examination he says:—"I did not know but I should take possession, for when we gave up possession I understood from my counsel that we could get possession again any time in twenty-four hours." This clearly indicates not a voluntary but involuntary giving up of possession. The fact that they thus consulted counsel in respect to their rights is significant. On the whole I am inclined to think that the jury under this instruction came to a correct result.

I am also inclined to the opinion that the court below correctly charged that an unlawful and forcible displacement of the plaintiffs, under the circumstances, did not terminate the policy. They were certainly entitled to a reasonable time in which to reinstate themselves, and I think we cannot say that there had been any unreasonable delay.

Moreover, Mr. Bacon, the man who was in the actual charge of the depot, had the charge and control of it from the time the policy issued until the building was destroyed. It is apparent therefore that the nominal change of possession did not increase the risk, and that the objection to a recovery now urged is purely technical.

It is further objected that the plaintiffs cannot recover because of their personal claims; and it is suggested that their interest as trustees has been converted into a personal interest. That is not, as I regard it, a correct view of the case. The facts show that a small part of the expenses of the trustees was for personal services and advancements. A large portion of it, exceeding one-half, was for liabilities incurred and assumed, and not paid when the decree was ·assed, in June, 1875; and there is no evidence that they had been paid at the time of the fire. Now if it be assumed that the plaintiffs cannot hold this policy as security for their

personal claims, still their liability to other parties continues, and that keeps alive their trusteeship, and their official interest in the policy.

But aside from that I think there is no force in this objection. When the fire occurred the plaintiffs, as trustees, were owing $83,000. This policy then became a claim, and was a part of the assets in their hands to be applied in payment of that indebtedness. A part of that indebtedness was due to themselves personally and a part to other parties. I think they are entitled to collect this policy; and when collected, whether paid to one creditor or to another, to themselves personally or to others, can make no possible difference.

In this opinion GRANGER, J., concurred.